UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.:  3:15-cr-30177-1 SMY |
| | ) |
| SON CHONG FULTON, | ) |
| | ) |
| Defendant. | ) |

## SENTENCING MEMORANDUM

COMES NOW Defendant, Son Fulton ("Fulton"), by and through counsel, and files the following memorandum for sentencing.

### I.  Procedural Background

On December 11, 2015, the government filed a two-count information, alleging Fulton twice violated Title 31 U.S.C. § 5324(a)(3).  See Information [Doc. Text #2].  On January 27, 2016, Fulton pled guilty to the information, see Presentence Investigation Report at ¶ 1 [hereinafter "PSR"], and did so pursuant to a written agreement.  See id.  In the agreement, the parties estimated a total offense level of 18 and a criminal history category of I.  See id. at ¶¶ 4, 8.  The PSR confirms these estimates, see id. at ¶ 40, and calculates an advisory guideline range of 18-24 months.  See id. at ¶ 74.  Consistent with the plea agreement, Fulton requests a sentence at the low-end of this range based on her history and characteristics and the nature and circumstances of the offense.

### II.  Sentencing Rules

18 U.S.C. § 3553(a) requires this Court to impose a sentence sufficient, but not greater

1

than necessary, to comply with the purposes of sentencing.  There are four purposes of sentencing[1] and six factors to consider in connection with them[2].  The guidelines are only one factor to consider, see United States v. Kimbrough, 552 U.S. 85, 90 (2007), and deserve no greater weight than any other factor.  See id.  Consistent with these rules, this Court may not presume a sentence within the guideline range reasonable.  See Rita v. United States, 551 U.S. 338, 351 (2007).  Nor may it presume unreasonable a sentence outside the guideline range.  See United States v. Gall, 552 U.S. 38, 51 (2007).  Likewise, this Court may not require "extraordinary circumstances" to justify a sentence different from that which the guidelines advise or "use a rigid mathematical formula to determin[e] the strength of the justification

---

[1] The purposes of sentencing are:

    (A)    to reflect the seriousness of the offense; to promote respect for the law; and to provide just punishment for the offense;
    (B)    to afford adequate deterrence to criminal conduct;
    (C)    to protect the public from further crimes of the defendant; and
    (D)    to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D).

[2] The six factors to consider in connection with the purposes of sentencing are:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2)    the kinds of sentences available;
    (3)    the guidelines promulgated by the Sentencing Commission;
    (4)    any pertinent policy statement issued by the Sentencing Commission;
    (5)    the need to avoid unwarranted sentencing disparities among similarly situated defendants; and
    (6)    the need to provide restitution to the victims.

18 U.S.C. § 3553(a)(1)-(7).

required for a specific sentence." See id. at 47.  These rules apply whether the guideline derives from the expertise of the Commission or a policy determination of Congress.  See Kimbrough, 552 U.S. at 109-110.

### III.  Fulton's History and Characteristics

Fulton was born in 1958 to parents she never knew and reared in a South Korean orphanage until about 12 years of age, when she left to work as a live-in servant for a nearby family.  With a seventh grade education, Fulton worked for two families over the next four years.  She left the second at 16 and turned to prostitution to support herself, as did many young women on the margins who found a steady stream of income in the cache of customers kept at a nearby military base.

At 17, Fulton met Richard Ratliff ("Ratliff"), a patron 16 years her senior who served in the military and with whom she struck up a relationship.  The two married a year later and moved to Houston, Texas, only to return to Korea the following year as part of a short term re-deployment.  Fulton gave birth to couple's only child, Stephanie, now 36, while abroad.  Six or so months later, Ratliff was reassigned to Hawaii and the family relocated to Oahu where they remained until Ratliff completed his military obligation.

Settled, Fulton struggled to adjust to her new life in the States as a mother and wife and turned to alcohol to smooth the transition.  Ratliff drank along with her and, in time, the two grew apart and unhappy with the marriage.  Ratliff left with Stephanie for Houston, Texas two years later.

In their absence, Fulton worked as a waitress and part-time prostitute until a colleague

suggested she relocate to Dallas, where a contact owned a spa at which Fulton could work and live. Fulton moved not long after and remained in the Dallas, Texas area for the next ten or so years until local police closed the spa down. She moved to the Decatur, Illinois area thereafter, where an acquaintance of a co-worker owned a massage parlor no different than the spa in Dallas.

Fulton left Decatur for the St. Louis Metropolitan area about a year later, where she met Richard Donini ("Donini"), a customer and small business owner who she married in 1996. Donini was murdered five months later while visiting family in New Orleans.

Fulton returned to full-time work until 2001 when she married Darren Fulton, a carpenter she met two years earlier at a local casino. Like Fulton, he drank and gambled too much and abused Fulton physically and emotionally. The marriage ended six years after it began.

Two years on, Fulton used income earned over a lengthy career built on low-overhead professional arrangements to open a Japanese restaurant in St. Louis County. The restaurant failed about 18 months after it opened, and Fulton reverted to more familiar work. She bought an already functioning spa in Centerville, Illinois which she owned and operated from 2012 until the government initiated the instant prosecution.

Fulton sold the property on which the spa operated earlier this year, pursuant to the terms of her plea agreement. At sentencing, she will relinquish the sale funds to the government, along with almost all funds remaining in her escrow account. Her Edwardsville home will constitute her sole remaining asset, an asset she will likely have to sell to support herself in the future.

As the PSR notes, Fulton has a history of alcohol abuse and gambling, but no history of illicit drug use. She also has a limited education, speaks little English, and, at 58, has a very

small set of marketable skills.

## IV. The Nature and Circumstances of Fulton's Offense

Between January 22, 2014 and August 11, 2015, Fulton structured $190,800 in United States currency through a series of cash deposits into a bank account opened in her own name at an FDIC insured financial institution. Fulton generated the cash from the spa she operated since 2012. Two women worked at the spa in the three years Fulton owned it. Neither woman was charged with an offense. Nor were the men who used the spa's services. The spa closed in 2015, and Fulton sold the property earlier this year.

The nature and circumstances of Fulton's offense are strikingly similar to a recently completed case in the Southern District of Illinois: United States of America v. Kyong Kipilla, 3:15-cr-30125 MJR (S.D. IL 2016). Like Fulton, Kyong Kipilla ("Kipilla") pled guilty to two counts of structuring funds earned through a massage parlor she owned and operated in Centerville, Illinois. Like Fulton, Kipilla is a South Korean national who came to the States about three decades ago through a marriage to a United States military enlistee. As did Fulton's, Kipilla's marriage failed several years after it began and she supported herself as a prostitute in the years that ensued. Over time, she saved enough to buy a small operation in Centerville, Illinois and, in fact, owned the spa Fulton purchased in 2012. For guideline purposes, Kipilla structured $17,900 and, consequently, had a guideline total offense level 10, not 15, and an advisory guideline range of six to 12 months, rather than 18 to 24. Kipilla structured more than $17,900, however. She structured an additional $101,671.37. The PSR excluded this sum from her guideline calculation, though, because of the dates on which she conducted the transactions.

Had the PSR included this sum in her calculation, her total offense level would have risen to 13 and her advisory guideline range would have upped to 12-18 months.  This point was not lost on the court, the government, or defense counsel who discussed the matter in some detail at sentencing.  Nevertheless, the court imposed a sentence of two years probation with six months of home incarceration and a $20,000 fine to which the parties agreed in their written agreement.  Given the substantial similarities between these offenses and the self-abusive histories of the offenders who committed them, Kipilla's outcome suggests this Court should impose no more than a low-end sentence in this case.

   WHEREFORE, for all the foregoing reasons, Defendant Fulton respectfully requests this Honorable Court impose a sentence no greater than 18 months, along with the fine agreed to by the parties in their written agreement.

               Respectfully submitted,

               ROSENBLUM, SCHWARTZ, ROGERS & GLASS, PC

      By:  /S/ Adam D. Fein
         ADAM D. FEIN, #52255 MO
         Attorney for Defendant
         120 S. Central Avenue, Suite 130
         Clayton, Missouri 63105
         (314) 862-4332/Facsimile (314) 862-8050

**CERTIFICATE OF SERVICE**

   I hereby certify that on May 19, 2016, the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Mr. Stephen Clark, assistant United States attorney.